## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS PETOFF, | : | Civil No. 3:24-cv-78 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| LT. DELMONICO, *et al.*, | : | |
| | : | |
| Defendants | : | |

### MEMORANDUM

Plaintiff Thomas Petoff ("Petoff"), an inmate in the custody of the Federal Bureau of Prisons ("BOP"), initiated this *Bivens*[1] action pursuant to 28 U.S.C. § 1331.  (Doc. 1). Named as Defendants are Lieutenant Delmonico, Nurse Yonkin, and two John Doe individuals at the Federal Correctional Institution, Allenwood, Pennsylvania ("FCI-Allenwood").  Before the Court is a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) and/or for summary judgment pursuant to Federal Rule of Civil Procedure 56, filed by Defendants Delmonico and Yonkin.  (Doc. 14).  For the reasons set forth below, the Court will grant Defendants' motion.  The Court will also dismiss the action against the John Doe individuals pursuant to Federal Rule of Civil Procedure 4.

---

[1]   In *Bivens*, the Supreme Court created a federal tort counterpart to the remedy created by 42 U.S.C. § 1983 as it applies to federal officers. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

I.    <u>**Statement of Undisputed Facts**</u>[2]

Petoff alleges that Defendants placed him in the Special Housing Unit ("SHU") where he experienced unlawful conditions of confinement, and incurred the loss of good conduct time, in retaliation for filing a grievance against Defendant Yonkin.  (Docs. 1, 1-2).  The crux of Petoff's claim is that "Nurse Yonkin wanted to punish [him] for filing a grievance on her." (Doc. 1-2).

A.    **Petoff's Sentence & Incarceration History**

The United States District Court for the Western District of Pennsylvania sentenced Petoff to a 168-month term of imprisonment for his conviction of sex trafficking of a child and conspiracy to commit sex trafficking.  (Doc. 18 ¶ 1).  His currented projected release date is April 1, 2028, via good conduct time.  (*Id.*).

Petoff was incarcerated at FCI-Allenwood from June 20, 2019 to March 21, 2022. (*Id.* ¶ 3).

---

[2]    Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  *Id.*  Unless otherwise noted, the factual background herein derives from Defendants' Rule 56.1 statement of material facts and exhibits.  (Doc. 18; Doc. 18-6).  Although Petoff filed a brief in opposition to Defendants' motion, he failed to file a responsive fact statement.  Therefore, as authorized by Local Rule 56.1, the Court will admit as uncontroverted the statement of facts submitted by Defendants.  *See* LOCAL RULE OF COURT 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.");  *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613 (3d Cir. 2018) (finding that "the District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance").

**B.     Facts Regarding Petoff's Disciplinary Proceedings**

On October 10, 2021, Defendant Yonkin issued Incident Report Number 3555869 to

Petoff, charging him with violating code 114 for the offense of sexual assault by threat or

force. (*Id.* ¶ 5). In the Incident Report, Defendant Yonkin described the incident as follows:

> On October 10, 2021, at approximately 02:45 P.M., Inmate Petoff Reg
> number (37150-068) knocked on the health services pill line window stating
> the recreation officer sent him to Health Services to repair a screw that fell out
> of his wheel chair. Inmate Petoff stated that he could repair it himself and that
> he just needed a screwdriver. I unlocked the door to health services letting
> him into the lobby. I then asked inmate Petoff what type of screwdriver he
> needed. I then continued to the back of health services to where our tools are
> kept. I unlocked the door to the back of health services and when I turned
> around to relock the door behind me inmate Petoff attempted to follow me into
> the back of Health Services. I stated to him No, you are not coming back
> here you need to stay in the lobby. I then returned to the health services
> lobby with two different sized screwdrivers and handed inmate Petoff one he
> said would work. Inmate Petoff attempted to fix the wheel himself and stated
> he was unable to and requested that I assist him due to the location of the
> component needing fixed. I then knelt down behind inmate Petoff's wheel
> chair attempting to tighten the screw back into place when inmate Petoff
> placed his hand over mine. I then pulled my hand away from inmate Petoff's
> and attempted to maneuver away from him. While attempting to maneuver
> away from inmate Petoff he reached out with his left hand and placed it on my
> buttocks. I was then able to maneuver away from inmate Petoff and I told him
> do not touch me. I gave inmate Petoff a direct order to provide me with his
> identification card so I could notif[y] the Operations Lieutenant to which he
> complied. Inmate Petoff then stated what are you worried about? The
> camera can't see over here. I then immediately notified the Operations
> Lieutenant.

(*Id.* ¶ 6).

On October 10, 2021, Defendant Delmonico prepared a Memorandum regarding the

incident and stated as follows:

On October 10, 2021, at approximately 2:45 pm, health services staff S. Yonkin was assisting inmate Petoff, Thomas, Reg. No. 37150-068, in the health service waiting room replacing a component of his wheelchair. While S. Yonkin was attempting to assist inmate Petoff he placed his hand over her hand. S. Yonkin then pulled her hand away from his and stood up. S. Yonkin attempted to maneuver away from inmate Petoff when he reached out and caressed her buttocks with his left hand and stated 'what are you worried about? The camera can't see over here.' S. Yonkin immediately notified the operations lieutenant. Inmate Petoff was placed in hand restraints and escorted to the special housing unit where he was visually searched, metal detected, breathalyzed, ordered to provide a urinalysis, medically assessed with no injuries noted and placed in an appropriately assigned cell.

(*Id.* ¶ 7).

On November 4, 2021, Petoff appeared before the Unit Discipline Committee ("UDC"). (*Id.* ¶ 8). The UDC found that Petoff committed the prohibited act as charged based upon the preponderance of the evidence and the details in the Incident Report. (*Id.*). The UDC recommended sanctions including disallowance of 41 days of good conduct time, disallowance of 50 days of non-vested good conduct time, and a $500 monetary fine. (*Id.*). The UDC then referred the matter to a Discipline Hearing Officer ("DHO") for further disposition. (*Id.* ¶ 9.)

The disciplinary hearing convened on December 9, 2021. (*Id.* ¶ 10). The DHO verbally advised Petoff of his rights, noted that he received advanced written notice of the charges on November 2, 2021, documented that Petoff indicated that he understood his rights, and that he requested a staff representative. (Doc. 18-6, pp. 2-3). No procedural issues were cited by Petoff. (*Id.* at p. 3). Petoff's staff representative appeared at the hearing and stated that he reviewed the closed-circuit television ("CCTV") footage and did

4

not see anything on camera which supports a charge, or the body language of the staff

member. (*Id.*; Doc. 18 ¶ 11). Petoff also testified at the hearing, and stated:

> I went to the yard and a screw in my wheelchair popped out and I was told to
> go to medical to get it fixed. I told her what was wrong and to try to tighten
> the screw and she did and it was still loose so I tightened it and when I was
> leaving she said she couldn't believe I wrote her up and I said that is the only
> way things get done and I left the area. There was no one else in the area.
> The officer is lying.

(Doc. 18 ¶ 12; Doc. 18-6, p. 3).

Petoff requested two fellow inmates to present witness testimony on his behalf.

(Doc. 18 ¶ 13). The first witness stated: "I was in the Special Housing Unit at the time of the

incident, I was not in Health Services." (*Id.* ¶ 14). The second witness stated: "I was in

SHU and not in Health Services at the time of the incident." (*Id.* ¶ 15). In reaching a

decision, the DHO relied upon the Incident Report, the investigation, the Duties of Staff

Representative form, medical assessments, staff injury assessment, CCTV, staff

memoranda, photographs, the Inmate Rights at Discipline Hearing form, and Notice of

Discipline Hearing Before the DHO form. (*Id.* ¶ 16). The DHO ultimately concluded that

Petoff committed the prohibited act of conduct which disrupts, most like sexual assault by

threat or force, in violation of code 199, most like 114. (*Id.* ¶ 18).

The DHO authored the following statement in support of his findings (including a

rewrite of the incident report):

> On October 10, 2021, at approximately 14:45, Inmate Petoff Reg number
> (37150-068) entered the health services lobby requesting assistance fixing
> his wheelchair. While I was attempting to fix his wheelchair inmate Petoff

5

placed his hand over mine. I pulled my hand away from inmate Petoff's and attempted to maneuver away from him when inmate Petoff reached out with his left hand and placed it on my buttocks. I then told inmate Petoff do not touch me. I'm calling the Lieutenants Office. Inmate Petoff then stated what are you worried about? The camera can't see over here. I then immediately notified the Operations Lieutenant. Inculpatory evidence in the form of CCTV surveillance footage corroborated the evidence cited in this report. The video footage depicts Ms. Yonkin opening the entrance door and Petoff entering Health Services Department. Ms. Yonkin walks to the back of Health Services with Petoff following in his wheelchair. Petoff looks up at the CCTV briefly and wheels his chair off camera view and remains off camera view for several minutes. CCTV depicts Petoff back on camera conversing with Ms. Yonkin and then exits the area. Ms. Yonkin immediately returns to the office area. Lt. Delmonico provided a memorandum stating on 10/10/21 at 2:45pm indicating Ms. Yonkin was assisting Petoff repairing a component of his wheelchair. Ms. Yonkin was attempting to assist Petoff when he placed his hand over her hand. Ms. Yonkin pulled her hand away from his and stood up. Ms. Yonkin attempted to maneuver away from Petoff when he reached out and caressed her buttocks with his left hand and stated, "What are you worried about, the camera can't see over here." Ms. Yonkin notified Operations Lieutenant and Petoff was placed in SHU.

(*Id.* ¶ 19).

The DHO noted that he believed the information provided by the staff member involved in the case, as she derived no known benefit by providing false information. (*Id.* ¶ 20). The finding of guilt for the code 199, most like 114, violation resulted in disallowance of 41 days of good conduct time, the forfeiture of 150 days of non-vested good conduct time, a monetary fine, loss of phone privileges, and disciplinary segregation. (Doc. 18-6, p. 5). At the conclusion of the hearing, the DHO advised Petoff of his appeal rights. (*Id.*).

Petoff proceeded to appeal the DHO decision concerning Incident Report Number 3555869, via Administrative Remedy Numbers 1107140-R1 and 1107140-R2. (Doc. 18 ¶

22). Upon review, the Regional Office denied the appeals. (*Id.*). Petoff then appealed to

the Central Office, designated as Administrative Remedy Numbers 1107140-A1 and

1107140-A2. (*Id.* ¶ 23). The Central Office denied the appeals. (*Id.*).

Petoff has not overturned the DHO's finding for Incident Report Number 3555869 in

a habeas corpus proceeding. (*Id.* ¶ 24).

## II.   Legal Standards

### A.   Federal Rule of Civil Procedure 12(b)(6)

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it

does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The

plaintiff must aver "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129

S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop.*

*Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words,

"[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted). A court "take[s] as true all the factual

allegations in the Complaint and the reasonable inferences that can be drawn from those

7

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to
> determine the sufficiency of a complaint:  First, the court must take note of the
> elements a plaintiff must plead to state a claim.  Second, the court should
> identify allegations that, because they are no more than conclusions, are not
> entitled to the assumption of truth.  Finally, where there are well-pleaded
> factual allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged - but it has not show[n] - that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks

omitted).  This "plausibility" determination will be a "context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable or

futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a
> defendant moves to dismiss it, unless the district court finds that amendment
> would be inequitable or futile, the court must inform the plaintiff that he or she
> has leave to amend the complaint within a set period of time.

*Id.*

### B.     Federal Rule of Civil Procedure 56

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a).  "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once such a showing has been made, the non-moving

party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P.

56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

### C.   *Bivens* Claim

A *Bivens* civil rights action asserted under 28 U.S.C. § 1331 is evaluated using the same standards applicable to a 42 U.S.C. § 1983 civil rights action. *See Paton v. LaPrade*, 524 F.2d 862, 871 (3d Cir. 1975). To state a claim under *Bivens*, a plaintiff must allege that he was deprived of a federal right by a person acting under color of federal law. *See Young v. Keohane*, 809 F. Supp. 1185, 1199 (M.D. Pa. 1992).

III.    **Discussion**

Defendants move to dismiss, or seek summary judgment, on the following grounds:

(1) a *Bivens* remedy is not available for Petoff's First, Fifth, and Eighth Amendment claims;

and (2) even if the Court were to extend *Bivens* to this case, the favorable termination rule

bars Petoff's claims.  (*See* Doc. 19).  The motion is ripe for resolution.[3]

A.     **A *Bivens* Remedy is not Available for Petoff's Claims**

Defendants argue that Petoff's retaliation, due process, and conditions of

confinement claims must be dismissed on the basis that there is no *Bivens* remedy

available for these First, Fifth, and Eighth Amendment claims following the United States

Supreme Court's decision in *Ziglar v. Abbasi*, 582 U.S. 120 (2017).  (Doc. 19, pp. 10-20).

The Court agrees and begins its discussion with an overview of *Bivens*.

In *Bivens*, the Supreme Court recognized an implied damages remedy for a Fourth

Amendment violation committed by federal officials, whose conduct was not encompassed

by the statutory remedy available against state actors under 42 U.S.C. § 1983.  *See Bivens*,

403 U.S. at 397.  Since the *Bivens* decision, the Supreme Court has extended the *Bivens*

remedy only twice: first, to a claim for gender discrimination under the Fifth Amendment's

Due Process Clause, *see Davis v. Passman*, 442 U.S. 228, 248-49 (1979), and later to a

---

³    Petoff's brief in opposition to Defendants' motion contains factual allegations that are not
expressly set forth in the amended complaint.  (*See* Doc. 21).  The Court may not consider such allegations
because a complaint cannot be amended by way of an opposition brief.  *See Pennsylvania ex rel.
Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not
be amended by the briefs in opposition to a motion to dismiss.").

claim for inadequate prison medical care under the Eighth Amendment's Cruel and Unusual

Punishment Clause, *see Carlson v. Green*, 446 U.S. 14, 18-23 (1980). "These three

cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has

approved of an implied damages remedy under the Constitution itself." *Ziglar*, 582 U.S. at

131. Over the years that followed, the Supreme Court "consistently refused to expand

*Bivens* actions beyond these three specific contexts." *Mack v. Yost*, 968 F.3d 311, 318 (3d

Cir. 2020).

In order to curb any further expansion of *Bivens*, the Supreme Court has established

a rigorous two-part test for courts to follow when determining whether a *Bivens* action

should be extended to a new context. *See Ziglar*, 582 U.S. at 139. Courts must first

determine "whether a case presents a new *Bivens* context" by asking "[i]f the case is

different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court."

*Id.* And if the case presents a new *Bivens* context, then courts must next determine

whether any special factors counsel hesitation in allowing an expansion of the doctrine. *Id.*

at 139-40.

In June of 2022, the Supreme Court's issued its decision in *Egbert v. Boule*, 596

U.S. 482, 492 (2022), and reemphasized that the Court's continued refusal to "imply a

similar cause of action for other alleged constitutional violations" is intentional—recognizing

a new *Bivens* cause of action is "a disfavored judicial activity." *See Egbert*, 596 U.S. at 483,

491 (quoting *Ziglar*, 582 U.S. at 136; *Hernandez v. Mesa*, 589 U.S. 93, 101-03 (2020)).

*Egbert* clarified that the two-step process laid out in *Ziglar* "often resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *See Egbert*, 596 U.S. at 492.  In other words: if there is "*any rational reason (even one)* to think that *Congress* is better suited" to determine the propriety of a cause of action, then a *Bivens* action cannot proceed.  *See Egbert*, 596 U.S. at 496 (emphasis in original).  The court must broadly inquire whether "there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate'"—and if the answer is "yes," or even potentially yes, the plaintiff cannot recover under *Bivens*.  *See Egbert*, 596 U.S. at 496 (quoting *United States v. Stanley*, 483 U.S. 669, 681 (1987)).

The Third Circuit's decision in *Fisher v. Hollingsworth*, --- F.4th ----, 2024 WL 3820969 (3d Cir. Aug. 15, 2024), handed down just last week, reiterated the framework that courts are to use before implying a cause of action for money damages in a new *Bivens* context.  The *Fisher* Court recognized that "*Egbert* tightened the *Ziglar* test and, in doing so, made a strong statement that lower courts should not extend *Bivens* beyond the contexts recognized in *Bivens*, *Davis*, and *Carlson*."  *Id.* at *4.  The Third Circuit further explained that *Egbert* modified *Ziglar*'s two-part inquiry in the following ways: "*Egbert*'s new articulation of [the first] step is clearer—and unequivocally narrows the universe of relevant cases to just three.  *Egbert* requires us to ask whether [a plaintiff's] case meaningfully differs 'from [only] the *three cases* in which the Court has implied a damages action'" and, with respect to the second step, "*Egbert* now requires us to ask whether 'the Judiciary *is at least arguably less*

*equipped* than Congress' to weigh the costs and benefits of a damages action [and,

further]...*Egbert* holds that an administrative grievance procedure *is* an alternative remedy

that forecloses a *Bivens* action." *Id.* (emphasis in original) (citing *Egbert*, 596 U.S. at 492,

497-98). Thus, the outcome of *Fisher* is, essentially, that extending a *Bivens* remedy to a

new context will be unavailable in all but the most unusual of cases. *See Fisher*, 2024 WL

3820969, at *5 ("unless a case is indistinguishable from *Bivens*, *Davis*, or *Carlson*, a

damages remedy may be created by Congress, but not by the courts").

　　Guided by this precedent, the Court proceeds with *Ziglar*'s two-step analysis and

must determine whether Petoff's *Bivens* claim presents a new context, and, if so, whether

any special factors counsel against extending a *Bivens* remedy here. As stated, Petoff

alleges that Defendants retaliated against him by placing him in the SHU. (Doc. 1-2). He

further alleges that, while in the SHU, his wheelchair was confiscated, his music player was

destroyed, he was denied food, and denied access to medical care, recreation, and the law

library. (*Id.*).

　　There is no question that these First, Fifth, and Eighth Amendment claims present

new contexts—they are "different in a meaningful way from previous *Bivens* cases decided

by [the Supreme] Court." *Ziglar*, 582 U.S. at 139. Petoff's instant claims on their face "bear

little resemblance" to "a claim against FBI agents for handcuffing a man in his own home

without a warrant; a claim against a Congressman for firing his female secretary; and a

claim against prison officials for failure to treat an inmate's asthma," the contexts previously recognized by the Supreme Court. *Ziglar*, 582 U.S. at 140.

First, the Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012). Additionally, the Third Circuit has held that *Bivens* may not be extended to First Amendment retaliation claims in the prison context. *See, e.g., Mack*, 968 F.3d at 319-25 (declining to extend *Bivens* to a First Amendment retaliation claim in the prison workplace assignment context).

Second, Petoff asserts a *Bivens* claim based upon allegations that his due process rights were violated under the Fifth Amendment when he was placed in the SHU. Although the Supreme Court has recognized a *Bivens* action for gender discrimination in violation of the Fifth Amendment, *see Davis*, 442 U.S. at 230, Petoff's claim plainly presents a new *Bivens* context and is factually different from the gender discrimination context in *Davis*.

Third, Petoff sets forth a *Bivens* claim based upon allegations that his rights under the Eighth Amendment were violated in connection with his prison conditions at FCI-Allenwood. Although the Supreme Court recognized a *Bivens* claim in the prison context for inadequate medical care under the Eighth Amendment, *see Carlson*, 446 U.S. at 23-25, Petoff's claim is factually different from the medical care context in *Carlson*. His conditions of confinement claim is markedly different from the Eighth Amendment inadequate medical care claim recognized in *Carlson*. *See, e.g., Mammana v. Barben*, 856 F. App'x 411, 415

(3d Cir. 2021) (concluding that the plaintiff's Eighth Amendment claim based upon the unconstitutional conditions of his confinement presented a new *Bivens* context).

The landscape of a plaintiff's ability to bring different types of *Bivens* claims has changed drastically post-*Ziglar*.  While Petoff's claims may arise under the same constitutional amendments as *Carlson* and *Davis*, the Supreme Court has made clear that a common constitutional basis is not enough to link a new *Bivens* theory to an existing *Bivens* context.  *See Hernandez*, 589 U.S. at 103 (indicating courts must "look beyond the constitutional provisions invoked").  This case alleges different misconduct than *Carlson* and *Davis* and different legal standards would apply.  In sum, the Court concludes that Petoff's First, Fifth, and Eighth Amendment claims present new contexts for purposes of *Bivens*.

Because the Court concludes that Petoff's claims present new contexts, the Court must turn to the second *Ziglar* step and determine whether there are any special factors that counsel hesitation in the Court extending a *Bivens* remedy to such claims.  As explained by the Supreme Court, a special factor suggests that Congress is better equipped than the Judiciary to "weigh the costs and benefits" of creating a new damages remedy.  *Egbert*, 596 U.S. at 492 (citation and internal quotation marks omitted).  As discussed above, if "there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed,'" then the Court cannot imply a cause of action for damages under *Bivens*.  *Id.* at 496 (emphasis in original) (citation and internal quotation marks omitted).

Here, the Court finds that there are special factors that weigh against extending a *Bivens* remedy to Petoff's claims for alleged violations of his First, Fifth, and Eighth Amendment rights.  More specifically, the Court finds that the BOP's Administrative Remedy Program provides an alternative process for addressing Petoff's claims.  *See Fisher*, 2024 WL 3820969, at *7 ("hold[ing] that the BOP's Administrative Remedy Program precludes a *Bivens* remedy"); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (holding that "administrative review mechanisms" can provide "meaningful redress and thereby forelose[ ] the need to fashion a new, judicially crafted cause of action[,]" even if those mechanisms do not "fully remedy the constitutional violation…"); *Egbert*, 596 U.S. at 493, 497 (explaining that the availability of alternative remedies, such as a grievance procedure, is sufficient to foreclose *Bivens* and that it does not matter that existing remedies do not provide complete relief); *see also* 28 C.F.R. § 542.10(a) (providing that "[t]he purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement").

The Supreme Court has explained that such alternative remedy for aggrieved parties "independently foreclose[s] a *Bivens* action."  *Egbert*, 596 U.S. 497 (explaining that "court[s] may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure" and that "[i]f there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action" (citation and internal citations

and quotation marks omitted)); *see also Malesko*, 534 U.S. at 69 (stating that, "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability" (citation omitted)). Accordingly, "when alternative methods of relief are available," as they are here, "a *Bivens* remedy usually is not." *Ziglar*, 582 U.S. at 145.

In addition, the Court finds that "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action" in the context of disciplinary proceedings in federal prisons. *Egbert*, 596 U.S. 492. The Supreme Court has generally acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the *legislative* and *executive* branches of government," and that this "task that has been committed to the responsibility of *those* branches, and separation of powers concerns counsel a policy of judicial restraint." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (emphasis added) (internal citation and internal quotation marks omitted). Thus, extending a *Bivens* remedy to this new context "would step well into the lawmaking privilege delegated only to Congress, and well over the bounds of [the Court's] limited constitutional power." *Mammana*, 856 F. App'x at 415.

Furthermore, the Court finds that Congress' enactment of the Prison Litigation Reform Act ("PLRA") counsels hesitation in extending *Bivens* to Petoff's claims. Indeed,

"[s]ome 15 years after *Carlson* was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Ziglar*, 582 U.S. at 148 (citing 42 U.S.C. § 1997).  As a result, Congress "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs," but deliberately chose to "not provide for a standalone damages remedy against federal jailers."  *Id.* at 149.  This "legislative action suggest[s] that Congress does not want a damages remedy is itself a factor counseling hesitation" against extending a *Bivens* remedy to Petoff's claims.  *Id.* at 148; *see also Davis v. Samuels*, 962 F.3d 102, 112 (3d Cir. 2020) (stating that "Congress's post-*Bivens* promulgation of the [PLRA]" suggests that Congress does not want a damages remedy).

Finally, the Court recognizes the reasoning of *Ziglar* that "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others."  *Ziglar*, 582 U.S. at 136.  While "[i]t is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations[,] the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide."  *Id.*  Such an assessment "include[s] the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper

formulation and implementation of public policies." *Id.* These concepts "may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case." *Id.* at 136-37.

Thus, for all these reasons, the Court concludes that special factors counsel hesitation in extending a *Bivens* remedy to Petoff's claim for violations of his rights under the First, Fifth, and Eighth Amendments. *See Egbert*, 596 U.S. at 486 (stating that Supreme Court precedent has "made clear that, in all but the most unusual circumstances," a *Bivens* remedy should not be recognized in new contexts). Accordingly, the Court will dismiss Petoff's *Bivens* claim.

### B.    Favorable Termination Rule

Defendants next argue that, even if the Court were to extend *Bivens* to this case, the favorable termination rule bars Petoff's lawsuit because any determination regarding his disciplinary proceedings would necessarily implicate the invalidity of the disciplinary sanctions, which included the loss of good conduct time. (Doc. 19, pp. 20-24).

The Court finds that Petoff's claims are barred by the favorable termination rule announced in *Heck v. Humphrey*, 512 U.S. 477 (1994). "[H]arm caused by actions whose unlawfulness would render a conviction or sentence invalid" is not cognizable under § 1983, unless the conviction or sentence was "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at

486-87; *see also Leamer v. Fauver*, 288 F.3d 532, 542 (3d Cir. 2002) ("whenever the challenge ultimately attacks the 'core of habeas'—the validity of the continued conviction or the fact or length of the sentence—a challenge, however denominated and regardless of the relief sought, must be brought by way of a habeas corpus petition."). *Heck* applies to claims involving monetary damages as well as those seeking equitable and declaratory relief. *See Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court applied *Heck*'s favorable termination rule to prison disciplinary sanctions that affect the duration of a prisoner's incarceration.

Petoff challenges the loss of good conduct time he received as a sanction at the conclusion of his disciplinary proceedings. To the extent that Petoff seeks to overturn and expunge the disciplinary matter and sanctions, this would necessarily imply the invalidity of the underlying disciplinary proceeding and its sanctions. This type of post-hoc, civil rights challenge to a prison disciplinary proceeding, that potentially affects the duration of confinement, is unequivocally barred by Supreme Court precedent unless the prisoner has demonstrated that the disciplinary charge has been invalidated. *See Edwards*, 520 U.S. at 643, 648 (1997) (applying *Heck* bar to inmate's Section 1983 due process challenge to prison disciplinary proceedings resulting in loss of good time credits); *Torres v. Fauver*, 292, F.3d 141, 149-50 (3d Cir. 2002) (holding that only challenges affecting fact or duration of confinement are barred by *Heck*'s favorable termination rule). Petoff has failed to present

any evidence that the disciplinary charges against him were dismissed.  Consequently, his

claims are barred under *Heck* and *Edwards*.

## IV.   Federal Rule of Civil Procedure 4

Rule 4(m) sets forth the following time frame a plaintiff has to serve a defendant with

the summons and copy of the complaint:

> If a defendant is not served within 90 days after the complaint is filed, the
> court -- on motion or on its own after notice to the plaintiff -- must dismiss the
> action without prejudice against that defendant or order that service be made
> within a specified time.  But if the plaintiff shows good cause for the failure,
> the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).  The John Doe Defendants were named in the complaint that was filed

on January 16, 2024 and, to date, have not been identified or served in this case.  The

Court must engage in a two-step process in determining whether to dismiss the unidentified,

non-served Defendants or grant Petoff additional time to effect service.  "First, the district

court should determine whether good cause exists for an extension of time.  If good cause

is present, the district court must extend time for service and the inquiry is ended.  If,

however, good cause does not exist, the court may in its discretion decide whether to

dismiss the case without prejudice or extend time for service."  *Petrucelli v. Bohringer &*

*Ratzinger*, 46 F.3d 1298, 1305 (3d Cir. 1995).  Good cause requires good faith on the part

of the party seeking an enlargement and some reasonable basis for noncompliance with the

time specified in the rules. *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097

(3d Cir. 1995).  In determining whether good cause exists, a court's "primary focus is on the

plaintiff's reasons for not complying with the time limit in the first place." *Id.* Although

prejudice is a factor to be considered, the absence of prejudice to the opposing party alone

does not constitute good cause to excuse late service. *Id.*

In the present matter, Petoff failed to establish good cause. After the expiration of

the ninety-day time period set forth in Rule 4(m), the Court notified Petoff that the action

against the John Doe Defendants was subject to dismissal and directed him to show cause

why the action against these Defendants should not be dismissed pursuant to Rule 4(m).

(Doc. 24; *see also* Doc. 10 ¶ 8). Petoff failed to respond to the Rule 4 show cause order,

and his *pro se* status is not good cause to excuse his failure to timely identify or serve these

Defendants. *Veal v. United States*, 84 F. App'x 253, 256 (3d Cir. 2004). Based upon the

lack of *any* explanation for his failure to adhere to the requirements of Rule 4, the Court

finds that Petoff failed to establish good cause.

If a plaintiff cannot show good cause for his failure to serve the defendant within

ninety days, a district court may either dismiss the defendant, or exercise its discretion to

order that service be made within a specific time. *Petrucelli*, 46 F.3d at 1305; *see also* FED.

R. CIV. P. 4(m). It is Petoff's responsibility to properly identify all defendants, and provide

accurate mailing addresses for the defendants, in a timely fashion. (*See* Doc. 10 ¶¶ 7-8)

(advising Petoff that failure to properly name a defendant, or provide an accurate mailing

address for a defendant, may result in dismissal of the claims against that defendant

pursuant to Federal Rule of Civil Procedure 4(m)).

In light of Petoff's lack of good faith effort to identify or serve the John Doe Defendants, despite this Court's warning of the possible consequences, including dismissal, the Court concludes that dismissal is appropriate under the present circumstances. Accordingly, the non-identified, non-served Defendants will be dismissed from this action.

**V.**    **Leave to Amend**

Before dismissing a complaint for failure to state a claim upon which relief may be granted, the Court must grant Petoff leave to amend his complaint unless amendment would be inequitable or futile.  *See Grayson v. Mayview State Hospital*, 293 F.3d 103, 114 (3d Cir. 2002).  The Court finds that amendment would be futile because Petoff cannot remedy the defects in the complaint: that *Bivens* does not extend to the First, Fifth, and Eighth Amendment claims, and that the favorable termination rule bars Petoff's claims.

**VI.**    **Conclusion**

The Court will grant the motion to dismiss and for summary judgment by Defendants Delmonico and Yonkin.  (Doc. 14).  The Court will also dismiss the action against the John Doe individuals pursuant to Rule 4(m).

A separate Order shall issue.

Robert D. Mariani
United States District Judge

Dated: August _20_ , 2024

24